**NORTH CAROLINA TEACHERS ASSOCIATION and Gaines W. H. Price, Appellants,**

**v.**

**The ASHEBORO CITY BOARD OF EDUCATION, a public body corporate, Appellee.**

**No. 11121.**

United States Court of Appeals Fourth Circuit.

Feb. 8, 1968.

---

Sobeloff and Craven, Circuit Judges, dissented in part.

Albert V. Bryan and Boreman, Circuit Judges, dissented.

J. LeVonne Chambers, Charlotte, N. C. (Conrad O. Pearson, Durham, N. C., Sammie Chess, Jr., High Point, N. C., Jack Greenberg and James M. Nabrit, III, New York City, on brief), for appellants.

Hal H. Walker, Asheboro, N. C. (H. R. Anderson, and Walker, Anderson, Bell & Ogburn, Asheboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges.*

WINTER, Circuit Judge.

Recently, in Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967), we had occasion to restate the requirements of the Fourteenth Amendment in regard to teacher displacement and discharge upon the reorganization of a school system to eliminate racial discrimination.[1] In this case, we are asked to decide whether the rights of Negro teachers in the nine schools comprising the school system of The Asheboro City Board of Education, a public corporation of the State of North Carolina, were violated, generally, when the beginning steps toward racially desegregated schools were taken in the school year 1965-66, and in particular, whether nine Negro teachers who were not re-employed for the school year 1965-66 are entitled to personal relief. Finding that no one had been denied due process of law or equal protection of the laws, the district court refused injunctive relief and dismissed the amended complaint.[2] We reverse and remand the case for further proceedings.

The essential facts, as found by the district court, are set forth fully in the court's opinion, 259 F.Supp. 238 (M.D. N.C.1966). Briefly stated, it appears that prior to the school year 1965-1966, defendant operated nine racially segregated public schools—five elementary schools, two junior high schools, one senior high school and a union school, Central High School, consisting of Grades 1-12. All Negro students, teachers and professional personnel were assigned to Central High School; all white students and teachers were assigned to the other schools in defendant's system.[3]

In February, 1965, defendant adopted a plan of compliance, pursuant to the requirements of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a et seq., under which Central High School was converted into an elementary school, consisting of Grades 1-6; approximately fifty-four Negro students, who lived outside of the City of Asheboro and who previously attended Central High School, were no longer permitted to do so; geographical

---

* The case was argued before the Court, consisting of Haynsworth, C. J., Sobeloff, Boreman, Bryan, Winter and Craven, JJ., on May 1, 1967. Subsequent to the appointment and qualification of Judge Butzner, counsel agreed to the resubmission of the case to the entire Court, including Judge Butzner, on the briefs and electronic tape of oral argument.

1. "It is now firmly established in this circuit (1) that the Fourteenth Amendment forbids the selection, retention, and assignment of public school teachers on the basis of race; (2) that reduction in the number of students and faculty in a previously all-Negro school will not alone justify the discharge or failure to re-employ Negro teachers in a school system; (3) that teachers displaced from formerly racially homogeneous schools must be judged by definite objective standards with all other teachers in the system for continued employment; and (4) that a teacher wrongfully discharged or denied reemployment in contravention of these principles is, in addition to equitable remedies, entitled to an award of actual damages." (Citing: Chambers

v. Hendersonville City Bd. of Educ., 364 F.2d 189 (4th Cir. 1966); Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966); Wheeler v. Durham City Bd. of Educ., 363 F.2d 738 (4th Cir. 1966); Franklin v. County School Bd., 360 F.2d 325 (4th Cir. 1966).

2. The initial complaint was filed by North Carolina Teachers Association, a professional teachers association, incorporated under North Carolina law, having approximately 12,500 members, most of whom are Negro teachers. During the course of the litigation the complaint was amended to make specific a prayer that teachers denied employment in violation of their due process and equal protection be reinstated in the same or comparable positions. At a later stage in course of pretrial proceedings, Gaines W. H. Price, a Negro teacher formerly employed by defendant, was permitted to intervene as a party plaintiff.

3. The only exception was during the school year 1964-65, when six Negro students requested reassignment and were assigned to two of the previously all-white schools.

zones were established for the elementary schools to which elementary students were assigned on a non-racial basis, with elementary students being allowed to transfer to schools other than the one to which they were initially assigned; and all junior and high school students were assigned on a non-racial basis to the two junior high schools and one senior high school.

When Central High was converted from an all-Negro union school into an integrated elementary school its faculty allotment was reduced from 24 to 11.[4] The faculty allotments of some of the other formerly white schools were increased, although the total allotment of teachers for the system was reduced from 209 in the 1964–65 school year to 206 in the 1965–66 school year.[5] For the school year 1965–66, 35 new teachers were employed.

After it was determined that the all-Negro faculty at Central High would be reduced in number by abolition of the junior-senior high school prgram, the qualifications of the faculty members, no longer needed at Central High, were compared within the area of their certification[6] to the qualifications of other faculty members in the same area of certification within the entire system. This comparison was made prior to May, 1965, on the basis of principals' recommendations and written evaluations, first instituted in the spring of 1965. Prior to the 1965–66 school year and, therefore, prior to the written evaluations previously mentioned, no written criteria for evaluating teachers under consideration for employment or reemployment were maintained.

On May 14, 1965, a letter was written and sent to almost all[7] Negro teachers on the junior-senior high school faculty at Central High School (10 in number), advising them that the defendant could not offer them a contract beyond the 1964–65 term, but that the applications of the teachers to whom the letter was mailed would be kept on file for consideration as vacancies arose, if they so desired. No white teachers received this letter, and white teachers who, for cause, were not to be rehired for the next school year were so notified prior to May 14, 1965. Before the May 14 letter, Negro and white teachers who were considered favorably for reemployment, and for whom a vacancy existed for the next year, had been mailed a letter containing an option to be completed and returned to defendant, indicating whether the teacher wished to resign, retire or be considered for employment.[8]

The teachers to whom the letter of May 14 was sent were not offered reemployment for the year 1965–66, but were to be considered for reemployment only as vacancies within the scope of

4. We note that the record discloses that all white children transferred from the elementary department of Central High to other schools when this conversion occurred.

5. Under North Carolina law, the State Board of Education determines for each administrative unit (the local boards of education) the number of elementary and high school teachers to be included in the State budget. N.C.G.S. § 115–59 (1966).

6. The authority to certify teachers is vested in the State Board of Education by N.C.G.S. §§ 115–11(14) and 115–153. No contract of teaching employment is valid unless the teacher has been so certified, except temporary employment under such rules as the State Board of Education may prescribe. N.C.G.S. § 115–152. The record discloses that certifications granted by the State Board of Education are limited to grades and subject matter.

7. The letter was not sent to the principal of the school or to one teacher who had already expressed her desire to retire. It was, however, sent to one elementary school teacher, Mrs. Brooks, who was being asked to resign.

8. This is the finding of the district court. Plaintiffs point to the testimony from which it can be argued that the finding is erroneous, i. e., the testimony that *all* teachers, including those who received the May 14 letter, were sent the option. Resolution of the correctness of the finding is unnecessary in our view of the proper disposition of the case.

their certifications arose; even then their qualifications as teachers were compared to the qualifications of new applicants. *Other teachers in the system are and were generally rehired each year and not required to meet this test, unless they achieved retirement age or unless good cause adversely touching upon their professional qualifications arose.*[9]

Although it was originally contemplated that more than nine Negro teachers would not be reemployed, in fact, only nine, who were not reemployed, complain of a denial of their rights in this proceeding,[10] eight of whom are high school teachers and one of whom is an elementary school teacher. We turn to the specific facts relating to each of the nine:

(a) *Gaines W. H. Price.* Mr. Price is the holder of a Bachelor's degree and a Class A certificate in music and science. He had seven years total teaching experience, three years with defendant's system. His primary work was that of a band director.

No new band directors were hired, and Mr. Price was compared with Messrs. Joseph B. Fields and H. E. Harrington, who were band directors. Both Fields and Harrington had Master's degrees with graduate certificates in music. Fields had been with the defendant's system nine years, and Harrington three years. The band Fields organized and conducted received the top rating of "superior" in a state competition for each of the years that Fields was the director.

New teachers in science were employed. Price was not seriously compared to them because he was treated as a band leader, notwithstanding his certificate in science, although it is claimed that, on comparison, the qualifications of the new teachers exceeded his.

(b) *Jackie E. Kilgore.* While Mr. Kilgore was not reemployed for the 1965–66 school year, the record is undisputed that he accepted employment in another school system before he was sent the May 14, 1965 letter.

(c) *Miss Pearline L. Palmer.* Miss Palmer held a Bachelor's degree and a two-year probationary Class A certificate in library science, renewable upon her demonstrating an improved average on the National Teacher Examination for renewal of her certificate. She had only one year's teaching experience. While she was compared with other librarians, her resignation was requested because of her unsatisfactory work. Notwithstanding the request for her resignation, she was asked, after May 14, 1965, if she would be interested in being considered for a library position which was anticipated to become available. According to the Superintendent of Schools, this inquiry was made of her "in spite of the fact that her record of performance with us was only poor, but to be sure that we didn't overlook any application which she might wish to make." Miss Palmer replied that she would not care to be considered.

(d) *Miss Sarah I. Peterson.* Miss Peterson held a Bachelor's degree and a Class A certificate in business education, and had two years' teaching experience. She taught the eighth grade, half-time, and commerce. She was considered for reemployment only as a teacher of business, and she was compared with Mrs. Anne Moore, Mrs. Ernestine D. Presnell

---

9. We do not read the findings of the district judge as concluding to the contrary. If they are given that reading, they are "clearly erroneous" as the following testimony of the Superintendent of Schools, who was the only one who gave evidence on the point, demonstrates:
   "Q. Is it a practice to rehire teachers year after year unless there is some objection by the principal or person in the administration who might deal in the evaluation of the teacher?

"A. The answer is yes, of course, except that retirement age—this is quite a natural thing if there's no objection, if there's no reason a person should not be employed and the position is there, certainly we consider them and employ them if there's a position available."

10. The record discloses that two additional high school teachers subsequently were reemployed in the system.

and Miss Stella Jane Walker. Mrs. Moore holds a Bachelor's degree and a Class A certificate in business education, and had fifteen years' experience in teaching. Mrs. Presnell held a Master's degree and graduate certificate in business education, and had four years' teaching experience. Miss Walker held a Bachelor's degree and a Class A certificate in business education, and had one year's teaching experience. The Superintendent of Schools testified that he considered Miss Walker "considerably above average for a person with the experience she has had," while Miss Peterson was considered only of "average or less" ability. While Miss Walker's overall written evaluation by her principal was "Average," as was Miss Peterson's, Miss Walker was rated "Above Average" on three of the five criteria used for purposes of evaluation and her performance provoked the comment "1st year teacher—is developing fast." Miss Peterson was rated "Average" on each of the same criteria. No new teachers were hired in business education. New eighth grade teachers were employed, but they held certificates entitling them to teach eighth grade subjects.

(e) *Louis H. Newberry.* Mr. Newberry held a Master's degree, graduate certificate in counseling, and either a graduate or Class A certificate in science and social studies. He had thirteen years' experience in teaching and counseling. Mr. Newberry utilized one-half of his time in counseling and the other one-half teaching the eighth grade.

No new counselors were employed, and, as a counselor, Mr. Newberry was compared to, and found not as qualified as, Mr. M. R. Prillaman, who held a Master's degree and graduate certificate in counseling, and had nine years' experience as a counselor, and Mr. Joseph R. Burns, who held a Master's degree and a graduate certificate in counseling, and had eleven years' total experience in teaching, four of which was devoted exclusively to counseling.

New teachers were employed in science and social studies. Mr. Newberry was considered for employment in this area of his certification, but his qualifications were thought less than those of new applicants and those of existing teachers in science and social studies. At the trial testimony was adduced from the Superintendent of Schools to show that Mr. Newberry had presented three worthless checks to the school system and to citizens of the community. The Superintendent had not mentioned this matter in his earlier discovery deposition when he discussed the reasons why Mr. Newberry was not rehired, and he characterized it at the trial as only an "annoying habit." No claim was made that this was sought to be made the basis for disciplinary action or discharge prior to the reduction in teaching personnel at Central High School; indeed, Mr. Newberry was recommended for reemployment by his principal. The documentary proof in the record shows that Mr. Newberry was not employed because of the absence of a vacancy for a counselor.

(f) *Mrs. Blondie J. Segers.* Mrs. Segers held a Bachelor's degree and a Class A certificate in music. She had a total of three years' experience, and spent half of her time teaching music and the other half teaching the seventh grade. No new music teachers were hired, and Mrs. Segers was compared to, and found less qualified than, Mrs. Louise Thomas, Mrs. Rose Patterson, Mrs. Marian Felton and Mr. John Allen. All of these other music teachers, except for Mrs. Patterson, had more advanced degrees, more advanced certificates, and greater teaching experience; and Mrs. Patterson, who had the same degree and teaching certificate as Mrs. Segers, had over three times as much experience as Mrs. Segers. Specifically, Mrs. Thomas held a Master's degree and a graduate certificate in music and had thirty years' experience; Mrs. Patterson held a Bachelor's degree and a Class A certificate in music and had ten years' experience; Mrs. Felton held a Master's degree and a graduate certificate in music and had eight years' experience; and Mr. Allen held a Master's degree and a graduate certificate

in music and had seven years' experience. Mrs. Segers was not considered for re-employment as a seventh grade teacher. New seventh grade teachers were employed, but they held certificates entitling them to teach seventh grade subjects.

(g) *Mrs. Marietta W. Foster.* Mrs. Foster held a Bachelor's degree and a Class A certificate in home economics and home science. She had thirteen years' experience, two or three in the Asheboro school system. While Mrs. Foster was compared with existing as well as new home economics and home science teachers, she received the May 14, 1965 letter for the reason, undisputed in the record, that hers was a vocational position, that she had had poor ratings for the previous two years from her state supervisor, and that her state supervisor said there was very much to be desired. Also undisputed is the testimony of the City Superintendent that, in view of these reports, the system "couldn't have kept Mrs. Foster under any circumstances."

(h) *Mrs. Janie A. Brooks.* Mrs. Brooks held a Bachelor's degree and a Class A *primary* certificate. She had ten years' teaching experience, two or three in the Asheboro system, and generally taught the first grade. The record discloses that, because of an adverse recommendation of the Director of Elementary Education, Mrs. Brooks' resignation was requested. The record shows also that, while she may have been recommended by her principal, his recommendation would not have been afforded much weight, with some justification, because the principal, in turn, was moved to resign to forestall his own discharge for cause.

(i) *Charles Holly.* Mr. Holly held a Bachelor's degree and a Class A certificate in industrial arts. He had fourteen years' teaching experience. The record is singularly bare as to any non-discriminatory reason why Mr. Holly's contract was not renewed, while the contracts of two other white industrial arts teachers, Edward R. Sugg and Joe V. Trogdon, both of whom had Bachelor's degrees and Class A certificates in industrial arts, but who had only five and two years' teaching experience, respectively, were renewed. Indeed, the City Superintendent of Schools testified that he considered Mr. Holly a very good teacher, although not better qualified than Sugg and Trogdon. Mr. Holly was sent the May 14, 1965 letter. Later, in June, 1965, a vacancy arose and, when Mr. Holly was offered the position, he did not accept.

Viewed against the background of the long history of racial discrimination and the presumption of discrimination which arose from the sudden decimation in the ranks of Negro teachers from the desegregation of Central High, Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4 Cir. 1966), we conclude from the facts stated that plaintiffs have established a denial of due process and of equal protection of the laws.[11] As in *Chambers*, the record shows that what occurred proceeded from the erroneous premise that when Central High was reconstituted to eliminate its all-Negro junior and senior high program, the Negro teachers who theretofore provided that teaching service lost their jobs—"teaching the Negro pupils"—and stood in the position of new applicants for employment.

Teachers Price and Newberry were clearly denied equal protection, in that they were required to pit their qualifications against those of new applicants

---

11. We reaffirm our holding in *Chambers* that a long history of racial discrimination, coupled with sudden disproportionate decimation in the ranks of Negro teachers when desegregation is finally begun, gives rise to an imputation of racial discrimination in the failure to rehire Negro teachers. Such circumstances, we repeat, cast the burden of proof on the school authorities to show that the failure to rehire was for non-discriminatory reasons, and require that the proof be clear and convincing before the failure to rehire will be upheld. See also Hawkins v. North Carolina Dental Society, 355 F.2d 718 (4 Cir. 1966). It is in accord with these principles that we decide this case.

to teach science and social studies, respectively, while no white teacher teaching either of these subjects was forced to run this gamut in order to be retained in the system. When a system's needs change as a result of compliance with the basic law of the land outlawing racial discrimination, the equal protection clause will not permit the teachers so displaced to be treated as new applicants to the system, unless all teachers, including those to be retained, are so treated. Those displaced teachers, absent good cause for the refusal to rehire, such as age or poor professional performance, must be given the same preference as to reemployment as that given to teachers not so displaced. Thus, we hold that when the constitutional requirement of racial equality compels realignment of the allotment of teachers, that realignment may not serve as a vehicle for other forms of discrimination, and that, accordingly, defendant should not have compared the qualifications of Price with the new applicants for science teaching positions, when those positions became available, but should have offered the opportunity first to Price. Only if and when he declined employment should new applicants have been considered. Similarly, Newberry should have been granted first opportunity to return to a position of teaching social studies, and only if he declined employment should new applicants have been considered. On this record we regard as pretextuous the attempted justification of the refusal to rehire Newberry for passing bad checks. Late assertion of the reason, its evident minimal weight, and, in the face of a recommendation for reemployment, the absence of any proof to show that it had been treated as a cause for disciplinary action make it lacking in substance.

■■ What we have said in the cases of Price and Newberry makes it clear that equal protection was violated also as to Peterson and Segers. While no new teachers were hired in preference to them, since no positions opened in the fields of their certifications, the defend-ant made it plain that they would be considered only on a comparative basis with new applicants. So to treat teachers displaced, when those retained were not so treated or compared, would violate equal protection. Notwithstanding that there was no system of tenure, defendant has never required any teacher not over-age and not having an unsatisfactory record, to have his qualifications compared with those of new applicants as a condition precedent to renewal of his contract. Equal protection demands no less when a teacher's contract is not renewed because of a lack of position resulting from the elimination of racial discrimination, when a vacancy, in his area of certification, arises.

■ Our finding of denial of equal protection as to Peterson and Segers is confined, however, to the failure to reemploy them *in the area of their certifications*. It is true that they taught, respectively, the eighth and seventh grades, half-time, although they were not certified so to do, and that new eighth and seventh grade teachers, certified to teach those grades, were employed. Our analysis of the record shows that Peterson and Segers were in this regard unique. Neither before nor after the beginning of desegregation of the Asheboro schools were teachers employed to teach all of the subjects of an entire grade when they held only a certificate to teach a single subject or subjects, although the record does disclose several instances where a teacher was employed to teach a single subject outside of the area of his certification. North Carolina law does not contemplate that a teacher shall teach outside of the area of his certification, except temporarily on an emergency basis.[12] We are told in oral argument that restriction to the area of certification is an important factor in school accreditation, and that the Asheboro school system is presently fully accredited. In short, the record does not develop the extent to which, in law, teachers having only subject certifications are permitted to teach entire grades; nor does the record reflect

12. See footnote 6.

any more than two examples of such a practice (Peterson and Segers); nor does the record reflect the effect, if any, upon accreditation if the practice is followed. Absent a definitive record on these important considerations, and absent evidence of a widespread practice on the part of the school authorities of employment of teachers to teach an entire grade outside of the area of their certifications, we conclude to require that Peterson and Segers should be given preferential rights of reemployment within their area certification, when and if a vacancy arises, but not to require their immediate reinstatement to teach the eighth and seventh grades, respectively.

In the case of Holly, we find that due process was denied when the defendant, upon whom the burden of proof was placed after the initial demonstration of a background of discrimination, failed to show why, prior to May 14, Holly was not retained, when the record clearly shows that he was as well qualified as the two white teachers retained in the system, and that he had much more experience than they had. Similarly, we find that defendant violated due process as to Price and Newberry by failing to consider them for teaching positions within the scope of their certifications which they were exercising, when the record is devoid of any evidence showing that they did so unsatisfactorily. We have already commented on Newberry's passing worthless checks as justifying now the failure to reemploy him. We add, however, that

if he is reinstated in accordance with the relief we grant, defendant is not to be foreclosed, in a proper case, from taking appropriate disciplinary action should such activities be resumed.[13]

Plaintiffs argue that additional denials of due process have been shown in the sending of the May 14 letter only to Negro teachers and in the absence of written criteria to evaluate the qualifications of teachers in subjects where available employment was diminished. We are not persuaded by these arguments. The May 14 letter was sent, as the record discloses, only after the qualifications of the Negro senior and junior high school teachers at Central High had been evaluated and compared with those of all similarly situated white teachers. Where that evaluation, or lack thereof, resulted in the denial of equal protection and due process, we have noted it, and will direct that relief be granted. We are persuaded, however, by our examination of the record, that the determination that Palmer, Foster and Brooks should not be reemployed was fairly made and that their rights were not prejudiced by the absence of written criteria for the written evaluations that were made. We note that such criteria were established for succeeding years.

We conclude that plaintiffs as a class are entitled to an order enjoining defendant from discrimination on the basis of race or color in the employment, assignment, dismissal and failure to rehire of teaching personnel. We conclude, also, that while Kilgore, Palmer, Foster

13. Mr. E. Edmund Reutter, Jr., Professor of Education at Columbia University Teachers' College, plaintiff's expert witness, who had no knowledge of Mr. Newberry's case, when asked what he would do about an individual who passed "worthless checks" described a proper course of procedure:

"If I were to evaluate individuals, I would have to go through the system and evaluate individuals. Now, the method here that would have to be applied would be in an investigation. Certainly this would be a prima facie situation that should be looked into by the

superintendent, investigated by the superintendent, and it could or could not be a reason for dismissing the teacher. Many of us have overdrawn our bank accounts and misunderstood things. On the other hand, this could be a scoundrel. But without a thorough investigation, and then having investigated the facts of the quote, worthless checks, end of quote, this would have to be in context with all of the other objective and subjective findings."

He was also permitted to express the opinion, without objection, that Mr. Newberry should not have been dismissed "under the procedures that were followed."

and Brooks are not entitled to any particular individual relief, Price, Newberry and Holly are entitled to money damages for defendant's failure to reemploy them for the school years 1965–66, 1966–67 and 1967–68, and to an order directing that, absent good cause they be offered reemployment within the scope of their certifications, without comparison with new applicants, for the school year 1968–69, and thereafter, or, alternatively, that money damages be paid them for the latter year. Proper damage elements will include those set forth in Wall v. Stanly County Board of Education, supra.[14] We conclude further, that Peterson and Segers are entitled to an order directing defendant to offer them reemployment in any vacancy within the scope of their certifications without requiring a comparison of their qualifications with those of new applicants, and, finally, are entitled to an inquiry by the district court, to determine if they were denied such employment while this litigation has been pending, in which event, they, too, shall be awarded damages for defendant's failure to have reemployed them at the earlier date, measured in accordance with Wall v. Stanly County Board of Education, supra. The order of the district court should require that these steps be taken under its continuing jurisdiction until the transition to a desegregated faculty is completed.

Reversed and remanded.

SOBELOFF, Circuit Judge (concurring in part and dissenting in part):

While I fully concur in that portion of the majority opinion which grants relief to Holly, Price and Newberry, I am not satisfied that denial of relief to the remaining complainants is justified. Especially in the cases of Segers and Peterson, I am of the view that the limited measure of relief granted them is inadequate.

The issue presented is whether the failure to continue the employment of the nine Negro teachers resulted from racial discrimination, as the plaintiffs contend, or from a fair and impartial evaluation of their qualifications, as the School Board insists. This issue assumes increasing importance as more school systems move to bring themselves into compliance with the Civil Rights Act of 1964, in order to qualify for benefits under Health, Education & Welfare Department regulations adopted pursuant to Title 4 of that Act. Unfortunately a not uncommon side effect of school desegregation plans has been the immediate loss of employment by Negro teachers.

Confronting this problem, our court only recently enunciated the doctrine that "in the face of the long history of racial discrimination * * * and the failure of the public school system to desegregate until forced to do so by litigation * * * the sudden disproportionate decimation in the ranks of Negro teachers *raise[s] an inference of discrimination which thrust[s] upon the School Board the burden of justifying its conduct by clear and convincing evidence.*" Chambers v. Henderson City Board of Education, 364 F.2d 189, 192 (4 Cir. 1966) (emphasis added). The mandate of *Chambers* is plain; it is that the School Board must demonstrate, with "clear and convincing evidence," that its decision to release the Negro teachers was in no way motivated by racial considerations. The Board has fallen far short of meeting this burden.

As the majority correctly concludes, the record in the instant case demonstrates a pattern of discrimination that refutes, in varying degrees, the asserted good faith of the Asheboro School Board in its decision to retain some teachers while dismissing others. The criteria on which the Board's determination was made are certainly suspect, for the evalu-

14. In the case of Holly, under the standards of the *Stanly County* case, his maximum monetary recovery may not be measured by loss of wages beyond the date in June, 1965 that he refused reemployment and may thus be *de minimis*, unless he can present proof that, because of initial refusal to rehire him, he entered into an employment contract, at a lower salary which prevented his acceptance of the subsequent offer of employment.

ation process was highly subjective. According to the uncontroverted testimony of Dr. E. Edmund Reutter, Jr., Professor of Education at Columbia University Teachers College, the procedure had "within it some serious flaws of invalidity, unreliability, and arbitrariness when weighed against generally accepted standards of personnel administration." Professor Reutter specifically challenged the Board's primary reliance on principals' evaluations, stating that this procedure was "not sufficiently formalized to carry out standards at a minimum level in the school system * * *."

Superintendent Teachey, testifying for the defendant, recounted that the Board, in making its evaluations, relied heavily on the teacher's classroom performance as reflected in the principal's highly subjective evaluations. Yet he admitted that in the case of the Negro teachers little weight was accorded the favorable recommendations of the principal of the previously all-Negro school, because he was deemed "less qualified" than the other principals in the system. No further explanation of this principal's alleged deficiency is offered. Placing almost exclusive reliance on the recommendations of school principals throughout the system, and then virtually ignoring the Negro principal's observations and recommendations, the Board all but eliminated the possible reemployment of the Negro teachers. The contrasting practices in respect to the recommendations of white and Negro principals operated uniformly to the disadvantage of the Negro teachers. If it was bad personnel administration, as Professor Reutter noted, to rest heavily on principals' evaluations in respect to white teachers, it was doubly wrong and indefensible to depart from the practice in the case of the Negroes.

After arriving at its decisions in the manner described, the Board sent a letter to the Negro teachers informing them that they would not be rehired. Notably, the letter was sent only to the Negro teachers, and this strongly supports the appellants' contention that they were dealt with as a distinct group. Fundamentally, the dispute before this court concerns the fairness of the evaluation, and the letter furnishes an additional insight into the central question of whether the Board looked upon the teachers as one group or two.

Analysis of the dismissals of the nine Negro teachers further contributes to the aura of discrimination that permeates the entire record. In the case of Mr. Holly, as the majority acknowledges, the decision was made on a purely discriminatory basis. Then too, teachers Price and Newberry were compared with and found less qualified than new applicants despite the stated policy against subjecting teachers already in the system to that type of comparison. That these three should be granted immediate relief, as the majority orders, I wholeheartedly agree. But we must not view the remaining cases in isolation. We have already referred to Dr. Reutter's condemnation of the criteria used in the teacher evaluations. The majority explicitly declares that these evaluations were premised on the very assumption that was condemned in *Chambers*: that with the coming of integration, Negro teachers would lose their jobs—the teaching of Negro pupils —and that they therefore were to be considered as new applicants for jobs in the newly integrated system. Finally, the majority itself is convinced in the cases of Holly, Price and Newberry that the evaluation was conducted in a discriminatory manner. Surely then, in light of "the long history of racial discrimination" in the Asheboro School System and the proven discrimination relating to the above mentioned plaintiffs, coupled with "the sudden disproportionate decimation in the ranks of Negro teachers," the court should not so readily embrace the School Board's disavowal of discrimination in the cases of the remaining plaintiffs.

It is within the context of the entire record that the dismissal of Segers and Peterson should be evaluated. Prior to the reshuffling of faculties in the Asheboro system, both of these teachers were

considered qualified to teach seventh and eighth graders, despite the fact that their certifications did not include those grades. Suddenly, with the advent of desegregation, the Board discovered a necessity to employ new certified teachers to fill their positions. This course was pursued although the only established hiring policy before the initiation of the desegregation plan was to retain teachers unless their principals made adverse recommendations. It appears that both Peterson and Segers had been recommended for reappointment.

Although the majority accepts the Board's contention that employing a teacher outside his areas of certification may adversely affect the school system's accreditation, it is plain that exceptions have been made.[1] And while the majority unquestionably is correct in saying that the record "does not develop the extent to which, in law, teachers having only subject certifications are permitted to teach entire grades; * * * nor does the record reflect the effect, if any, upon accreditation if the practice is followed," it is fair to observe once more that the *Chambers* rule casts upon the Board, not the teachers, the burden of clarifying these factors. Why should the court assume in the absence of plain proof, that to retain a seventh and an eighth grade teacher would suddenly endanger the accreditation of the entire system? One cannot refrain from asking what is the meaning of the apparently unprecedented rigorous insistence of full certification at the moment student populations are being integrated and the faculties should be. Why this newborn concern about accreditation? Since the system is fully accredited, and Peterson and Segers had been teaching in the seventh and eighth grades for a number of years, it would seem that this practice had absolutely no effect on the system's accreditation.

Significantly, in other instances new teachers were employed and assigned to teach in fields outside their areas of certification. One illustrative case is that of a new physical education teacher who, though not certified to teach mathematics, was employed to fill a vacancy in that department. Why was the position not offered to Holly, who, while not certified in mathematics was considered an excellent teacher, or Newberry who had thirteen years of teaching experience and a certificate in science, or to Price with his seven years of experience and a certificate in science, or even to Miss Peterson with her background in business education? Any of these four would appear to be at least as qualified to teach mathematics as a new teacher certified only in physical education. The failure of the Board to offer the position to any of these plaintiffs or to make a similar exception for either Segers or Peterson further reflects on its good faith.

Teachers Segers and Peterson are in fairness entitled to immediate reinstatement. Putting them on a waiting list is no sufficient remedy and only encourages the conduct complained of. By the time an opening arises, these teachers will probably be in no position to accept an offer of reinstatement and will have suffered irreparable damage. Our brother Craven objects that Peterson and Segers are given a qualified preference by being put on a waiting list, subject to call if in the future there occurs a vacancy which they are qualified to fill. He suggests that they are thus being favored in a manner unwarranted under State law. The short answer is that the majority merely undertakes to redress a denial of a federal constitutional right, although in my view the remedy is less than complete. Far from being favored, they are still left at a distinct disadvantage, for it is plainly evident from this

---

1. While it is difficult to determine from the record the precise number of teachers employed outside their area of certification, it appears that for the school year in question at least six teachers not certified in mathematics were employed in that area and that a teacher certified in library science and Bible was assigned to teach language arts. Three of these seven were newly hired teachers in the system.

record that if they were white their contracts would have been renewed automatically. They would not have been disturbed and would not find themselves in their present predicament. On any reading of the record, they have, without fault on their part, sustained severe injury from the action belatedly taken by the Board to rectify a gross, long-standing constitutional wrong to members of their race. I submit that the remedy accorded them is not as thorough-going as the occasion demands. A court of equity has ample latitude to fashion a complete remedy for persons like these admittedly qualified teachers. We should strive to prevent injustice to Negro teachers as the price of integrating the schools.

As for the remaining plaintiffs to whom no relief was granted, Brooks and Foster were dismissed on the basis of their principal's or supervisor's recommendation, while the record shows that Stone, a white teacher, was retained despite an adverse recommendation by his principal. It may be worth noting that the Negro principal whose favorable recommendations were cast aside because he was deemed "less qualified," was qualified enough to warrant the Board in following his unfavorable recommendations as to Negro teachers. Finally, the majority summarily dismisses as moot the case of Mr. Kilgore because he accepted employment outside the Asheboro system. The record, however, indicates that his plans were made only after he was informed that many of the Negro teachers would not be reemployed the following year.

Despite the majority's demonstration seriously discrediting the overall good faith of the Asheboro School Board, the court fails to follow through by ordering relief to Brooks, Foster, Kilgore and Palmer, and gives only a bare shadow of relief to Peterson and Segers. The conclusion I regretfully draw is that the burden of proof doctrine, given wise and forthright recognition in *Chambers,* though not laid aside in so many words— for it is solemnly repeated—is nevertheless denied effective application. This result is made possible by the re-introduction, probably not even conscious, of the traditional requirement of specific proof of bias and arbitrariness in the case of each of the plaintiffs as if the entire background of general discrimination were irrelevant and the burden had not shifted from the plaintiffs, or been lightened. Thus the theoretical shifting of the burden of proof to the Board is effectively canceled out. I trust that this represents no permanent retreat from *Chambers,* which made amply clear that a background of discrimination raises a presumption against school boards and thrusts upon the officials the burden of proving the reasonableness of their actions by "clear and convincing evidence." We must not sap this salutary doctrine of its vitality.

This case has an importance greater than the fate of a few individuals. Discriminatory dismissal of Negro teachers has too often been a supplemental technique in the persistent resistance to school desegregation. When, as in Asheboro, pupil desegregation comes about after long delay, we see it accompanied by refusal to renew the contracts of Negro teachers who would otherwise not have been dislodged from their jobs. This injustice has wide ramifications. With rare exceptions, compliance with Brown v. Board of Education was not begun willingly, and one of the reasons frequently asserted in defense of inaction has been that the Negro parents themselves did not want to end the existing segregation. It was generally insisted that nothing need be done by school officials until Negro children or their parents moved to invoke the law. This insistence bore heavily upon the Negroes because of the many obstacles placed in their way.

In the very nature of the situation thus created, Negro teachers could be expected to have an influence in their communities to counsel and guide parents in the assertion of their legal rights. But if the result of any successful move is to deprive these teachers of their means of

livelihood, their influence will certainly not be effectively exerted to encourage demands for desegregation. It is not reasonable to demand of Negro teachers a degree of fortitude and altruism not ordinarily found in any other segment of the human race. The fate of these teachers is an unmistakable warning to others to go slowly. In this fashion the injustice to the individual plaintiffs adds one more pressure to the many, both crude and subtle, that operate to block school integration.

For all of these reasons it must be insisted that bland assertions by the School Board that its decisions were free of racial considerations do not suffice to discharge its burden. In this case, the Board's decision resulted in the wholesale dismissal of a group of teachers, some of whom were able to adduce explicit proof of discrimination. The Board has not met the burden resting upon it in these circumstances of proving that its decisions were not racially motivated. There was no showing, as there should be, that records subjected to comparison were compiled before the purported evaluations and that decisions were based on previously established objective criteria. By casting about among several criteria, relying first on one, then on another, always to the detriment of the Negro being compared,[2] the Board has not satisfied the legal standard of objectivity.

I would order the plaintiffs reinstated and award them compensation for lost wages from the time they were deprived of their positions until they are so reinstated.

ALBERT V. BRYAN, Circuit Judge (dissenting).

Notwithstanding the thought and force evinced in the majority opinion, I cannot accept its conclusions. I think (1) they are extrajudicial, factual decisions on teacher selection, an administrative matter solely and wholly for determination by the school authorities; and (2) the conclusions allow the claimants to prevail on the basis of Constitutional rights but of which they have not in fact been deprived.

I. The Court holds that the passing of worthless checks by a student counselor-teacher, Newberry, not only to the Board of Education but as well to citizens in the community, did *not* justify the Board in refusing him re-employment. The holding rests on the premise that this was not the reason stated by the Board. That it was one of the reasons is incontestable in the record. In any event, aware of the offense, it is not too much to presume that the Board believed a bad-check man was not a proper person to counsel children.

The majority refers to his principal's recommendation that he be retained. But the Board rejected the recommendation. Baldly, this teacher's conduct was just not honest. The number and repeated instances refute inadvertence as an excuse. I cannot understand the majority's unwillingness to appraise the misbehavior for what it was—a series of fraudulent pretenses. The Court's reliance on an opinion of an "expert" for support of its conclusion recognizes its weakness. I had not thought falsity eraseable through expertise. Now the Board's leniency in not warning or firing him at once is cited to prove the Board used the admitted offense as a pretext.

2. As the majority opinion clearly indicates, the School Board relied alternatively on experience, graduate degrees and principals' recommendations when comparing the Negro applicants with their white competitors. Dominant weight was always given to the criterion that operated in favor of the white and against the Negro teacher. For example, Mrs. Segers, with the same degree and the same certificate as her white competitor, failed to be retained because, it was pointed out, the latter had longer experience. Miss Peterson, on the other hand, lost her job to a white teacher with the same degree and the same certificate who had *less* experience, but in this case the experience factor yielded to the "better" recommendation given by the white principal.

The lesson to the Board today is this: fire immediately; you give a teacher another chance at your own risk.

This single incident is typical of what I find to be the primary, permeating defect of the majority opinion: the Court's repeated overriding of the school authorities' judgment upon teacher selection despite reasonable grounds stated for each determination, which in turn are shown to be based on an intimate knowledge of the teachers. This usurpation is compounded when it is recalled that, in addition, the District Judge has in every instance also previously examined the facts and found the actions of the school authorities not without merit. These findings are not, and cannot be, declared clearly erroneous so as to warrant their rejection under F.R.Civ.P. 52(a). There is no Constitutional mandate for overturning administrative resolutions because of disagreement with them.

In this intrusion upon the school officials' determinations in the choice of the most competent teachers, it is notable that the Court does not dispute or even doubt that the best qualified teachers have been picked. Nor can even the plaintiff truthfully say that the selected teachers do not have qualifications at least equal to the claimants'. The majority of the Court finds no fault in the Board's mode of evaluation or appraisal of teachers. The plaintiff's attack is mounted, and the Court's decision is put, exclusively on the accusation that the Board's culling of those who were not to remain violated the Equal Protection and Due Process Clauses.

Before reviewing this charge, it should be noticed that four of the nine claimants are found by the Court to have no individual grievance whatsoever—a rocking impeachment of the suit's good faith. In the remainder of the instances the following recapitulation of the Court's overthrow of the Board's decisions will conclusively reveal the Court's substitution of its own judgment for the Board's conclusions. Here is a condensed recount of the facts about each of the nine:

(a) *Gaines Price.* He was not re-employed because it appeared to the Board, on comparison that the qualifications of the new teachers exceeded his. Notwithstanding, the Court awards him damages for the defendant's failure to keep him, and re-employment is now ordered to be offered to him.

(b) *Jackie Kilgore. He was not re-employed because he had accepted employment elsewhere before receiving notice that he would not be retained.* Nevertheless, a claim was asserted in the suit for him as one injured by the failure of the Board to re-employ him.

(c) *Pearline Palmer.* She was asked if she would be interested in re-employment notwithstanding prior notice to the contrary, but *she replied that she did not care to be re-employed.* Still the suit avers she has been injured by the Board.

(d) *Sarah Peterson.* She was a business education teacher. She was considered only of "average or less" ability, with two years experience, and was not chosen in the place of other teachers who were equally qualified, one of whom had 15 years experience. No new teacher was hired in business administration, so she was not ousted by a replacement. Nevertheless, the trial judge is ordered *to consider an award of damages to her if a replacement was later hired.*

(e) *Louis Newberry.* He is the worthless-check writer. The Board dropped him. Yet, the Court orders him reinstated and awards him damages for his non-employment. The opinion refers to the Superintendent's characterization of the check passing only as an "annoying habit", as if it were a mere peccadillo. Only a glance at the Superintendent's testimony is needed to refute this implication. Actually, he was endeavoring to save Newberry's reputation by "playing down" the misconduct. Here again Newberry abuses the consideration given him.

(f) *Blondie Segers.* She was a music teacher and was not re-employed because the other music teachers far outclassed her qualifications. No new music teacher was put in her place. Notwithstanding, the Board is ordered to offer her a

preference for re-employment, and the District Court is directed to ascertain whether she is entitled to damages if a replacement was later hired.

(g) *Marietta W. Foster.* She had poor ratings for the previous two years from the State supervisor, and the City Superintendent states that the system "couldn't have kept Mrs. Foster under any circumstances". Nevertheless her claim was prosecuted in this case as one injured through nonre-employment.

(h) *Janie A. Brooks.* A first grade teacher, her resignation had been requested at the instance of the Director of Elementary Education. Here again, a claim was advanced for damages for her nonre-employment.

(i) *Charles Holly.* He was an industrial arts teacher. If his nonre-employment was unjustified in May 1965 when he was notified of it, this was corrected *in June when he was offered the position but did not accept.* Still, the Court now awards him damages for his nonre-employment.

II. To repeat, the unretained teachers have been declared by the Court to have been denied equal protection of the laws and due process because of the manner of their selection. The alleged deprivation consists of this: they were considered for re-employment only as vacancies arose, and even then their qualifications were compared with those of new applicants, while other teachers in the system were generally rehired each year and not required to meet this test.

The District Judge had found—on the basis of specific and repeated instances in the testimony—that these factual premises *are just not true*—that the old teachers also were actually compared with the new.

The District Judge's finding reads:

"17. *Each* teacher not offered employment for the school year 1965–66 was compared with all other teachers in his or her area of certification—including *those with previous service* in the defendant's school system and *those new to the system.*" (Accent added.)

In a discussion of the equal protection claim, he continued:

"As stated in the Court's Findings of Fact, the displaced Negro teachers were not treated as new applicants, considered only for vacancies existing in the system, but were considered for positions for which they were qualified and *compared with white and Negro teachers who had during the preceding year been the occupants of those positions* and signified a desire to be re-employed." (Accent added.)

Indeed, the majority, too, actually so finds, saying the "qualifications of the faculty members, no longer needed * * * were compared within the area of their certification to the qualifications of the other faculty members in the same area of certification within the entire system". The District Court also found that in the end "the teachers employed * * * possessed qualifications superior to those not employed".

Furthermore, even assuming that due process and equal protection demanded that the unretained teachers be considered for re-employment not only to fill vacancies, but for presently occupied positions along with all of the other similarly classified teachers in the system, and assuming too that the previous teachers were not required to be compared with the new applicants, as were the present complainants, the last-named were not deprived of reinstatement or otherwise hurt as a result of the violation of any Constitutional mandate. Except for Holly—whose injury was immediately corrected—there was no causal connection between the alleged Constitutional breaches and their failure of rehiring. They lost out for an entirely different reason—a want of requisite qualifications.

The final tally revealed that the unre-employed teachers' qualifications did not measure up to those of *either the older teachers or of the new.* If the unretained teachers rated below both of

these classes, how were they robbed of any Constitutional right? They were rejected solely because of their own deficiencies; they could not match the old or new teachers in competency. The Constitution hardly makes up the difference for them.

Here the District Judge has tediously, thoroughly and comprehensively looked into each individual complaint as well as the alleged class grievance. He has related what he saw; he has said why in fact and in law there was no injustice, deliberate or inadvertent. There is no justification whatsoever for overruling his decision.

The Court's opinion today seems to me to be occupied with Constitutional principles in the abstract. Certainly they are not controvertible; they just have no predicate here.

The District Court should be affirmed.

BOREMAN, Circuit Judge, authorizes me to state that he joins in this opinion.

CRAVEN, Circuit Judge (dissenting in part).

I readily concur in the court's opinion except with respect to the granting of relief to Miss Sarah I. Peterson and Mrs. Blondie J. Segers.

The majority concedes that "no new teachers were hired in preference to them." [1] Miss Peterson "was compared" [2] with other teachers engaged in the same certification area and found wanting. Mrs. Segers was likewise "compared to, and found less qualified than," [3] named competitors.

It is thus established that Miss Peterson and Mrs. Segers were fairly and not discriminatorily displaced. Yet, the court holds that Miss Peterson and Mrs.

Segers may not be treated differently with respect to comparison with new teacher applicants *in the future* than the retained teachers were treated *in the past*. This is the closest the court can approximate what it calls "equal protection." That it is not very close is not the court's fault. The disparity of treatment that remains after the court's strenuous effort is simply the fault of non-invidious displacement. The fault of the court, as I see it, is its refusal to recognize that non-invidious displacement can and does create a teacher classification that is not unreasonable and that does not collide with the Fourteenth Amendment.

That there *is* such a classification— whether or not recognized by the court— is apparent from the unique status conferred on Miss Peterson and Mrs. Segers by the court's decision. They are accorded something to be envied by other North Carolina teachers who sadly lack it: tenure of office. It is, of course, only tenure of a sort—an interrupted sort— that is given Teachers Peterson and Segers. The court holds that the School Board acted *rightly* in not employing them for the school year 1965–66 because no new teachers were hired and Miss Peterson and Mrs. Segers were not as well qualified as those retained in employment. But that does not, as I would have thought, end the matter. Although Miss Peterson and Mrs. Segers had no right to be employed in 1965–66, they are held to be entitled to employment *at any time* subsequently that a vacancy occurs in their areas of certification. Since this is true for no other teachers [4]— white or Negro—in North Carolina, I am unable to agree that the Equal Protection Clause of the Fourteenth Amendment commands it. Nor does it seem to me very equal.

1. Page 744, opinion of the court.

2. Pages 741, 742, opinion of the court. The court does not suggest that the comparison was unfair.

3. Pages 742, 743, opinion of the court.

4. The right to fill a vacancy does not pertain, of course, to retained teachers.