Cornell REYNOLDS, Appellant,

v.

ABBEVILLE COUNTY SCHOOL DIS-
TRICT NO. 60, Robert H. Gettys, Admin-
istrative Superintendent of Abbeville
County School District No. 60, Walter R.
Hilley, C. H. Hawthorne, Duncan Carmi-
chael, Sam Ferguson, James B. Jones,
Jr., William M. Kay, Wallace Scott, S. F.
Shepard and Charles W. Williams, Indi-
vidually and as members of the Board of
Trustees of Abbeville County School Dis-
trict No. 60, and John McDill, Erskine
Link, James Ferguson, H. M. Laboon,
David Dunlap, Perrin Anderson, Ronald
Moss, William Brown and John Brickle,
Individually and as members of the
Abbeville County Board of Education,
jointly and severally and the successors
in the offices of each, Appellees.

No. 76–1565.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 8, 1976.

Decided May 11, 1977.

H. Christopher Coates, Columbia, S. C. (Laughlin McDonald, Neil Bradley, Atlanta, Ga., David Rubin, Nat. Ed. Ass'n, Washington, D. C., on brief), for appellant.

Walter A. Reiser, Jr., Columbia, S. C. (Robert L. Hawthorne, Jr., Abbeville, S. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BUTZNER and FIELD, Circuit Judges.

BUTZNER, Circuit Judge:

Cornell Reynolds appeals the judgment of the district court in favor of the superintendent and board of the Abbeville County School District. He claims that his demotion from a principalship during the deseg-

regation of the school system in 1970 and his discharge from an administrative assistant position the following year were motivated by racial discrimination in violation of the thirteenth and fourteenth amendments and 42 U.S.C. §§ 1981, 1983. He seeks reinstatement as principal, backpay, attorney's fees, and other relief. We reverse the judgment of the district court and remand the case for further proceedings.

## I

Abbeville County maintained a segregated school system until the Attorney General of the United States brought an action for compliance with the civil rights laws. Prior to desegregation, the school system employed Reynolds and three other black principals in the black schools and nine white principals in the white schools. Employed by the school system for sixteen years, Reynolds had twenty-five years' experience as a principal, teaching principal, and teacher. He held bachelors and masters degrees, pursued post-graduate studies, received an A on the National Teachers Examination, and was qualified to teach in both elementary and secondary schools. His experience, education, and examination grade determined his level of certification in the school system.

When the system was desegregated, two of the black elementary schools were closed. Reynolds, the principal of one, was transferred to a newly-created position as administrative assistant to the superintendent. Tharp, the principal of the other, was assigned an assistant principalship. During the same school year, a white man replaced a white high school principal who had been discharged for cause.

The following year, Reynolds was discharged. Another black principal, Moore, succeeded him as administrative assistant, and a white man replaced Moore as principal. Thus, within a year after desegregation, the number of black principals decreased from four to one (75%), while the

number of white principals increased from nine to ten (11%). The percentage of black principals in the school system was reduced from 31% to 9%.[1]

The superintendent, whose recommendations to the board determined the assignment of principals, testified that Reynolds was never considered for a principalship after the school system was integrated. To avoid dislocation of the faculty, he transferred Reynolds and Tharp to other positions solely because their schools had been closed. Consequently, he never compared their qualifications with those of other principals, and, indeed, he acknowledged that Reynolds has better credentials than several principals who were retained.

The superintendent also testified that Reynolds was not considered for the vacant position previously held by the white high school principal. Although Reynolds had been a principal and teacher for twenty-five years, a white man from another school system, with three years' experience as a high school classroom teacher, was hired to fill the vacancy. When Moore became the administrative assistant the following year, a white man with six years' teaching experience and less education than Reynolds was hired as principal. In support of these practices, the superintendent explained that he made a subjective judgment about the best person for the job. He said that other qualities might be more important than level of certification, but that he had no articulated, objective standards to guide his selections.

The superintendent furthermore testified that Reynolds and Moore were hired for the administrative assistant position because the administration needed the aid of a black person. Explaining that the black community distrusted the administration, he defined the assistant's primary role as helping members of his race by gaining their confidence. The position was retained for only two years. It was created when Reynolds' school was closed and abolished for

---

1. During the same period, the number of black teachers decreased from 68 to 58, while the number of white teachers remained 144. Prior to desegregation, 32% of the teachers were black; within one year after desegregation, 29% were black.

economic reasons when Moore, who was disillusioned with the job, retired because of his health.[2]

Despite his request, Reynolds was never given a description of the administrative assistant's duties, and, eventually, he wrote his own job description. After a period without any responsibilities, his first assignment was to accompany the attendance teacher and locate the homes of black students. His second assignment was to evaluate fourteen teachers whom the administration considered weak. All but two or three of these teachers were black. Although Reynolds accepted this assignment, he also observed other teachers, visiting approximately 75 classrooms. He thought that concentrating solely on the weak teachers would reinforce their sense of inferiority. The superintendent conceded that Reynolds' concern about creating a sense of inferiority was sound from an educational perspective. He nevertheless cited these differences over whom to evaluate as a reason for Reynolds' discharge.

Near the end of the school year, Reynolds met with the superintendent to discuss his work as an administrative assistant. In a post-conference memorandum, the superintendent noted that Reynolds did not believe he was suited for his present job and that he thought the administration wanted him to spy on black teachers and to support its criticism of them. The superintendent also noted that Reynolds had not filed visitation reports. He added that Reynolds "doesn't seem to be able to realize that it is his responsibility to support the release of a black when that person is incompetent. If he does, he is not willing, or so it seems, to do it." Shortly after the conference, Reynolds was discharged for failure to "properly carry out assigned supervisory duties."

**2.** Moore testified: "So I tried to do it until my health wouldn't let me and I quit. I just quit because I was out there on a limb. I had no specific things."

**3.** The superintendent declined, however, to write this in Reynolds' contract, explaining in a letter to Reynolds:

Before Reynolds accepted the administrative assistant position the superintendent had told him that if he worked for a year and found that he did not wish to continue in that position, he would be considered for a principalship.[3] Contrary to this assurance, he was not considered for a principal's position when he was relieved of his duties as administrative assistant.

After unsuccessfully appealing his dismissal administratively, Reynolds obtained an appointment as a high school science teacher in another school district.

## II

Reynolds claims that, when his school was closed because of desegregation, the board was required to consider him objectively along with all other black and white principals for the remaining principalships. He also contends that the history of segregation in the school system, together with the disproportionate displacement of black principals, establishes a prima facie case of racial discrimination. He asserts that the school officials did not rebut this prima facie case because they did not establish that his assignment and discharge were based on racially neutral considerations.

The school officials claim that they were not required to consider Reynolds for a principalship unless they proposed to discharge a disproportionate number of black personnel. Since only one black principal and one white principal were discharged, they contend that Reynolds had the burden of proving racial discrimination. They argue that the evidence supports the district court's finding that Reynolds failed to carry this burden.

■ We have consistently stated that the fourteenth amendment forbids discrimination in the selection, retention, and as-

It is also impossible for me to state what your job would be a year in advance. I have no assurance that I shall be here for contracts are issued on a one year basis. My statement that consideration would be given to you was based on the presumption that I would be the Superintendent at that time. *The author of the letter was the superintendent when Reynolds was dismissed.*

signment of faculty in the public schools. *Wall v. Stanly County Board of Education,* 378 F.2d 275, 276 (4th Cir. 1967).[4] Consequently, a school system cannot displace black faculty members merely because the black schools are closed or integrated as part of a plan for desegregation. If the plan reduces the number of positions, the school system must consider all of the faculty on the basis of objective, racially neutral criteria for the remaining positions. *Chambers v. Hendersonville City Board of Education,* 364 F.2d 189, 192 (4th Cir. 1966). Moreover, the displaced faculty, absent good cause for refusal to rehire, must be placed in any positions which later become vacant without comparing their qualifications to those of new applicants, unless all teachers are annually considered for re-employment in comparison with new applicants. *North Carolina Teachers Association v. Asheboro City Board of Education,* 393 F.2d 736, 743–44 (4th Cir. 1968). The same standards are applicable to principals. *Campbell v. Gadsden County District School Board,* 534 F.2d 650, 657 (5th Cir. 1976).

It is also well established that, in a school system with a history of segregation, terminating a disproportionate number of black faculty raises an inference of discrimination. The school authorities must rebut the prima facie case by showing through clear and convincing evidence that permissible, racially neutral selection criteria governed their conduct. *Keyes v. School District No. 1,* 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Chambers v. Hendersonville City Board of Education,* 364 F.2d 189, 192 (4th Cir. 1966); *see Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (dictum).

■ Measured by these standards, Reynolds has established a prima facie case of

racial discrimination. After litigation compelled the school district to integrate its de jure segregated system, three of four black principals were discharged or assigned other positions. All but one of nine white principals were retained, and two white men were hired for vacant principalships. In light of the history of segregation, the disproportionate reduction of black principals raises an inference of discrimination which must be rebutted by the school authorities. *Chambers v. Hendersonville City Board of Education,* 364 F.2d 189, 192 (4th Cir. 1966).

■ The school authorities did not seriously contest that Reynolds' assignment as an administrative assistant was a demotion. Both Reynolds and Moore testified that the job involved less responsibility and prestige than that of a principal. As principals, they had authority to set policies, supervise teachers, and direct the operations of a school. As administrative assistants, they had no staff, no control over policies, and few defined duties. Even though Reynolds' salary was the same as a principal's, his transfer to a position involving less responsibility and prestige was a demotion. *Campbell v. Gadsden County District School Board,* 534 F.2d 650, 656–57 (5th Cir. 1976); *Lee v. Macon County Board of Education,* 453 F.2d 1104, 1108–10 (5th Cir. 1971).

■ The school authorities also acknowledged that Reynolds was never considered for a principalship in an integrated school even though he had higher certification than several principals who were retained. Since only two black schools were closed, only the positions of the two black principals were terminated. The superintendent testified:

Q. Would it be fair to say then that you never considered giving Mr. Reynolds an-

---

**4.** "It is now firmly established in this circuit (1) that the Fourteenth Amendment forbids the selection, retention, and assignment of public school teachers on the basis of race; (2) that reduction in the number of students and faculty in a previously all-Negro school will not alone justify the discharge or failure to re-employ Negro teachers in a school system; (3) that teachers displaced from formerly racially ho-

mogeneous schools must be judged by definite objective standards with all other teachers in the system for continued employment; and (4) that a teacher wrongfully discharged or denied reemployment in contravention of these principles is, in addition to equitable remedies, entitled to an award of actual damages." *Wall v. Stanly County Board of Education,* 378 F.2d 275, 276 (4th Cir. 1967) (en banc).

other principalship because there were no vacancies, as you saw it?

A. That is correct.

The superintendent's failure to consider Reynolds for the remaining principalships was in direct conflict with *Wall v. Stanly County Board of Education*, 378 F.2d 275, 276 (4th Cir. 1967), where we stated that "teachers displaced from formerly racially homogeneous schools must be judged by definite objective standards with all other teachers in the system for continued employment."

█ Similarly, the superintendent's failure to consider Reynolds, absent good cause, for the positions that were filled by new employees violates the principles we established in *North Carolina Teachers Association v. Asheboro City Board of Education*, 393 F.2d 736, 744 (4th Cir. 1968):

> When a system's needs change as a result of compliance with the basic law of the land outlawing racial discrimination, the equal protection clause will not permit the teachers so displaced to be treated as new applicants to the system, unless all teachers, including those to be retained, are so treated. Those displaced teachers, absent good cause for the refusal to rehire, such as age or poor professional performance, must be given the same preference as to reemployment as that given to teachers not so displaced.

█ Moreover, Reynolds was discharged, not reassigned, when the school authorities became dissatisfied with his performance as an administrative assistant. For twenty-five years before the integration of the school system, his performance as a principal and teacher had been acceptable.[5] When he was assigned to the administrative position, he was told that he would be given consideration for a principalship if he was dissatisfied with the new position after working for a year. Consequently, his

differences with the superintendent over the nature and performance of his administrative work furnished no grounds for terminating his career as a principal. *Cf. Johnson v. Branch*, 364 F.2d 177, 180–82 (4th Cir. 1966).

We conclude, therefore, that the school authorities' failure to apply the precepts of *Wall v. Stanly County Board of Education*, 378 F.2d 275 (4th Cir. 1967), and *North Carolina Teachers Association v. Asheboro City Board of Education*, 393 F.2d 736 (4th Cir. 1968), establishes Reynolds' entitlement to relief. Indeed, these precedents support his case so firmly that he would prevail regardless of the allocation of the burden of proof.

### III

█ Reynolds is entitled to an order directing the school authorities to consider his reinstatement on the basis of definite, objective, uniform standards for the employment and retention of principals, giving full effect to his accreditation and experience. *Wall v. Stanly County Board of Education*, 378 F.2d 275, 278 (4th Cir. 1967); *Chambers v. Hendersonville City Board of Education*, 364 F.2d 189, 193 (4th Cir. 1966). If the incumbents are more highly qualified as measured by those standards, he should be hired for the next vacant principalship, absent good cause for failure to employ him. *North Carolina Teachers Association v. Asheboro City Board of Education*, 393 F.2d 736, 746 (4th Cir. 1968). Since the record does not indicate that all principals are annually considered for re-employment along with new applicants, the school authorities may not compare his qualifications with those of new applicants. *North Carolina Teachers Association v. Asheboro City Board of Education*, 393 F.2d 736, 746 (4th Cir. 1968).

---

5. Although Reynolds introduced evidence that prior to desegregation an attendance teacher responsible for black students had evaluated him less highly than other black principals, evaluations limited to black faculty may not be used to justify their discharge or demotion. *See Chambers v. Hendersonville City Board of*

*Education*, 364 F.2d 189, 191–92 (4th Cir. 1966). The school authorities never contended that they relied on these reports. Nor did they introduce any evidence that Reynolds' performance as a principal or teacher was unsatisfactory.

Under our past decisions, Reynolds would also be entitled to back pay and other expenses incurred because of his discharge. *See, e.g., North Carolina Teachers Association v. Asheboro City Board of Education,* 393 F.2d 736, 746 (4th Cir. 1968); *Wall v. Stanly County Board of Education,* 378 F.2d 275, 278 (4th Cir. 1967). Heretofore, such relief has been deemed appropriate under either 42 U.S.C. § 1981 or 42 U.S.C. § 1983. *Campbell v. Gadsden County District School Board,* 534 F.2d 650, 652–55, 658 (5th Cir. 1976) [42 U.S.C. § 1981]; *Thomas v. Ward,* 529 F.2d 916, 920–21 (4th Cir. 1975) [42 U.S.C. § 1983]. The Supreme Court, however, has granted certiorari to consider whether a school board and its officials are persons within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought. *Monell v. Department of Social Services,* 532 F.2d 259 (2d Cir. 1976), *cert. granted,* 429 U.S. 1011, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977) (No. 75–1914). On remand, the district court may, therefore, wish to defer proceedings concerning monetary relief until after the Court decides *Monell.*

The district court shall grant Reynolds his costs and reasonable attorney's fees. 20 U.S.C. § 1617; 42 U.S.C. § 1988, *as amended by* Civil Rights Attorney's Fees Awards Act of 1976, Pub.L.No.94–559, 90 Stat. 2641; *see Northcross v. Board of Education,* 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973).

*Reversed and remanded.*

HAYNSWORTH, Chief Judge, concurring:

Although I agree that Reynolds is entitled to an order directing the school authorities to consider his reinstatement, I do not agree that the defendants were wrong to have offered Reynolds the administrative post rather than to have compared him with the other principals.

To me, giving Reynolds the administrative post seems to have been the logical thing to do. It integrated the administration and gave Reynolds a task that, at the time, seemed suited to his ability. Moreover, it was a matter of considerable importance to provide a black administrator to evaluate black teachers in order to reduce black teachers' fear of bias. Reynolds thought his new job "sounded pretty good" when he initially accepted it. There is no evidence that Reynolds ever requested that he be considered for the vacant high school principalship or any of the other principals' positions. Although Reynolds had a great deal of teaching experience, he had never taught in a high school. In my opinion, the school officials should be commended for offering Reynolds a position which seemed to be suited to his abilities in an attempt to avoid displacing principals who were performing well.

At the time of Reynolds' assignment to the administrative post there was no sudden disproportionate decimation of the ranks of black teachers raising an inference of discrimination as there was in *North Carolina Teachers Ass'n v. Asheboro City Board of Education,* 393 F.2d 736 (4th Cir. 1968) and *Chambers v. Hendersonville City Board of Education,* 364 F.2d 189 (4th Cir. 1966). The school board merely transferred one black principal who was near the age of retirement to an assistant principalship and transferred Reynolds to an administrative post which had a principal's salary, although it turned out not to carry the prestige of a principalship.

But the school officials' actions in discharging Reynolds without considering him for a principalship even though he had been promised a principalship if his administrative job seemed unsatisfactory and, at the same time, replacing a black assistant principal with a white man with less experience and less education than Reynolds seems to require the conclusion that the discharge was discriminatory. Therefore, I concur in the result of the majority opinion.