364 F.2d 189
 1 Fair Empl.Prac.Cas. 488, 1 Empl. Prac. Dec. P 9741
Grace CHAMBERS, Doris Yvonne Greene, Mary Ann White and The
North Carolina Teachers Association, a
corporation, Appellants,
v.
The HENDERSONVILLE CITY BOARD OF EDUCATION, a public body
corporate, Appellee.
 No. 10379.
 United States Court of Appeals Fourth Circuit.
 Argued May 2, 1966.
Decided June 6, 1966.
 
 J. LeVonne Chambers, Charlotte, N.C. (Conrad O. Pearson, Durham, N.C., Ruben J. Dailey, Robert L. Harrell, Asheville, N.C., Jack Greenberg, Derrick A. Bell, Jr., and Melvyn Zarr, New York City, on brief) for appellants.
 Hoyle B. Adams, Hendersonville, N.C. (L. B. Prince, Hendersonville, N.C., on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, sitting en banc.
 J. SPENCER BELL, Circuit Judge:
 
 
 1
 The plaintiffs, Negro school teachers and their professional association, brought this class action seeking an injunction against the recially discriminatory policies and practices of the School Board of the City of Hendersonville.[1] The district court dismissed their complaint and denied them injunctive relief. We reverse and remand.
 
 
 2
 Prior to the school year 1964-1965 the school system of Hendersonville consisted of three 'white' and one consolidated Negro schools. In that year some pupil desegregation occurred on a freedom of choice basis as the result of litigation by the Negroes, but faculties remained rigidly segregated. There were approximately 81 white teachers employed at the three white schools and 24 Negro teachers at the consolidated Negro school. At the end of this school year the Negro enrollment dropped from 498 to 281 because 217 Negro students who had attended the consolidated Negro school from adjoining counties were by court order integrated into their respective county schools. For the school year 1965-1966, the Board abandoned its freedom of choice plan and integranted the remaining Negro pupils into the Hendersonville system on a single geographical zone basis. For this year the number of teacher jobs in the system was reduced by five. Of the twenty-four Negro teachers in the system only eight were offered re-employment for the year 1965-1966, although every white teacher who indicated the desire was re-employed together with 14 new white teachers, all of whom were without previous experience. In May of 1965, before he knew how many vacancies would exist for the next year, the superintendent advised the Negro teachers which ones would be retained. Acting on the assumption that their jobs had gone out of existence because of the withdrawal of the 217 Negro pupils, he recommended that the School Board retain only the number of seven Negro teachers which was the approximate 'pro rata' allotment based upon the number of the remaining Negro pupils under the North Carolina teacher=pupil ratio. On cross-examination of the superintendent, the School Board's attorney brought out that he and the superintendent had discussed the problem and concluded that the Negro pupils should have 'adequate representation at the teacher level.' In its answer the School Board unequivocally disclosed its view of the matter by stating that the Negro teachers had 'lost their jobs as a result of the social progress of integration.'
 
 
 3
 In its opinion, the district court, after reciting the above facts, asked itself the question whether this 'startling decimation of Negro teachers'-- from 24 to 8-- raises such an inference of racial discrimination as to place upon the defendants the burden of proof to the contrary. After concluding that no inference of discrimination whatsoever is raised by these facts, the court adds that the plaintiffs' argument is reduced solely to the contention 'that it is impossible that sixteen out of twenty-four Negro applicants (two-thirds) should be found inferior to white applicants with respect to qualifications for teaching.' The court then proceeded to reject this argument as having no foundation in logic or law, and concluded that the plaintiffs had the burden of persuading it with respect to each individual teacher that he or she was not re-employed for discriminatory reasons. The court then reviewed the 'reasons' offered by the superintendent for his failure to re-employ each of the Negro teachers and found that they were valid non-discriminatory reasons. We will not undertake to review the individual cases. It is clear from the record that the superintendent made all the decisions both as to the number and the identity of the Negro teachers to be re-employed. His acts were routinely ratified by the Board.
 
 
 4
 The school superintendent testified that he made the effective decision of all employment contracts; that he considered the principals' reports, but acted upon his own 'personal preference' based upon the principals' reports, since he did not have the opportunity for firsthand observation. The report submitted by the principal of the Negro school was the only report submitted in writing. It was extremely elaborate and meticulous, listing, with respect to each teacher, such qualifications as: personality, philosophy, reputation, general appearance, physical defeats, attitude, speech, optimism, love for children, age group in which interested, whether the principal wanted the teacher in his school, sense of humor, ability to discipline children, reaction of pupils and parents to teacher, and the principal's general appraisal of the teacher. On the other hand, the white principals' reports were oral, they could not remember details with respect to individual teachers, indeed one testified that he was not required to appraise his teachers but had done so voluntarily, and none testified that their reports attempted a comparative rating of their teachers. In short the Negro principal's report clearly reflected the knowledge that the number of Negro teachers was to be drastically reduced; consequently his teachers were graded comparatively while those of the white principals were used only to eliminate those teahcers who, in the opinion of the principal or the superintendent, fell below a minimun standard. The informal oral reports made by the white principal furnished no basis whatsoever for any objective rating of their teachers either within each school or within the system of with new applicants. While the superintendent contended that his decisions were not adversely influenced by the far more detailed and critical report of the Negro principal, he did not hesitate to use the adverse aspects of that report to justify his decisions in his testimony before the court. Thus he employed some Negroes because of a favorable recommendation by the principal but refused to employ others who had received equally favorable recommendations. Low N.T.E. scores were offered to justify failure to hire some teachers with years of experience although many teachers, both white and Negro, had never been required to take the tests. Seniority was of no help. In the case of one teacher with 39 years experience, her age was cited as a reason for refusal to hire, notwithstanding the fact that 9 white teachers with from 35 to 41 years of experience were retained. In a number of cases the Negro teacher's qualifications were compared unfavorably in one aspect or another with those of a new teacher who was hired to fill the vacancy, although no white teacher who desired to remain was required to pass this test. Thus, in the case of one Negro teacher the defendants made no attempt to show that she was other than a very food and competent teacher; the record evidenced no objective reason to support the failure to reemploy her, but the superintendent had simply concluded that three other teachers were better. Nevertheless the court, reviewing the above facts and conceding that his judgment would have been different, refused to substitute his judgment for the professional judgment of the superintendent. Reiterating that the burden was on the plaintiffs to prove that the defendants had acted discriminatorily and in bad faith, the court concluded that they had failed to carry this burden and dismissed the case.
 
 
 5
 Patent upon the face of this record is the erroneous premise that when the 217 Negro pupils departed and the all Negro consolicated school was abolished, the Negro teachers lost their jobs and that they, therefore, stood in the position of new applicants. The Board's conduct involved four errors of law. First, the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), forbids the consideration of race in faculty selection just as it forbids it in pupil placement. See Wheeler v. Durham City Board of Education, 346 F.2d 768, 773 (4 Cir. 1965). Thus the reduction in the number of Negro pupils did not justify a corresponding reduction in the number of Negro teachers. Franklin v. County School Board of Giles County, 360 F.2d 325 (4 Cir. 1966). Second, the Negro school teachers were public employees who could not be discriminated against on account of their race with respect to their retention in the system. Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966), and cases therein cited, wherein the court discussed the North Carolina law respecting teacher contracts and the right of renewal. White teachers who met the minimum standards and desired to retain their jobs were not required to stand comparison with new applicants or with other teachers in the system. Consequently the Negro teachers who desired to remain should not have been put to such a test. In Franklin v. County School Board of Giles County, 242 F.Supp. 371 (W.D.Va.1965), reversed as to remedy, 360 F.2d 325 (4 Cir. 1966), which involved the closing of a Negro school and the subsequent failure to re-employ the Negro teachers under circumstances very similar to this case, the court said:
 
 
 6
 'In view of the pre-existing policy, (a policy of treating all the teachers in the school district as a homogeneous faculty so that when a school was closed, its teachers were retained on an equal basis with all the other teachers in the system.) I believe that the Superintendent's stated policy with regard to these plaintiffs, i.e., to evaluate their right to continued employment in terms of the vacancies then existing in the other schools in the system rather than by comparison of their effectiveness with the other teachers in the system was too restrictive and its use in this particular instance resulted in a discrimination against these individuals.' At 374.
 
 
 7
 Finally, the test itself was too subjective[2] to withstand scrutiny in the face of the long history of racial discrimination in the community and the failure of the public school system to desegregate in compliance with the mandate of Brown until forced to do so by litigation. In this background, the sudden disproportionate decimation in the ranks of the Negro teachers did raise an inference of discrimination which thrust upon the School Board the burden of justifying its conduct by clear and convincing evidence. Innumerable cases have clearly established the principle that under circumstances such as this where a history of racial discrimination exists, the burden of proof has been thrown upon the party having the power to produce the facts. In the Field of jury discrimination see: Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Reece v. State of Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Avery v. State of Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); State v. Lowry, 263 N.C. 536, 139 S.E.2d 870 (1965); State v. Wilson, 262 N.C. 419, 137 S.E.2d 109 (1964). The defendants' reliance on Brooks v. School District of City of Moberly, Missouri, 267 F.2d 733 (8 Cir. 1959), is not well founded. In that case the School Board had promptly proceeded to desegregate following the Brown case. Furthermore, the facts showed that the School Board, prior to the end of the school year, carefully compared the qualifications of all the teachers, using previously established uniform standards. The procedure resulted in the failure to rehire both white and Negro teachers.
 
 
 8
 The plaintiffs as a class are entitled to an order requiring the Board to set up definite objective standards for the employment and retention of teachers and to apply them to all teachers alike in a manner compatible with the requirements of the Due Process and Equal Protection Clauses of the Constitution. All of the plaintiffs who desire to teach in the Hendersonville School system and who can meet the minimum standards of the Board are entitled to an order requiring their re-employment for the 1066-1967 school year[3] and an award of any damages which may have been incurred. Franklin v. County School Board of Giles County, 360 F.2d 325 (4 Cir. 1966). The order of the court should require that these steps be taken under its supervision until the transition to a desegregated faculty is completed.
 
 
 9
 Reversed and remanded.
 
 ALBERT V. BRYAN, Circuit Judge (dissenting):
 
 10
 The legal principles stated in the majority opinion may be accepted without agreement with its conclusion. The District Court evinced complete awareness of them, and entire adherence, I think. Casting upon the school authorities the burden to exonerate themselves of the imputation of racial discrimination, the Court scrupulously examined the circumstances in the case of each Negro teacher who was not re-hired. This was not merely a general survey but, rather, a careful and conscientious canvass of the reasons in each individual instance for not retaining the teacher. The majority opinion, however, sweepingly applies general principles to all released teachers and concludes, erroneously it seems to me, they were all denied their Constitutional rights.
 
 
 11
 For example, of the 16 Negro teachers not reemployed, 6 were not kept for personal or wholly objective reasons. One desired to retire; another did not wish to teach in an integrated school and declined to be considered for re-employment; another taught bricklaying only, and this class had been abolished for lack of students; another was refused because of objectionable personal habits, the nature of which the School Board was willing to reveal, but as plaintiffs' counsel could not express his consent to the admission of this testimony, the Court declined to receive it for fear of embarrassing him; still another was 56 years old, 5 feet 5 1/2 inches in height and weighed 219 pounds, and her physical condition was considered disabling; and the 6th was not retained for medical reasons, on the statement of her personal physician, then also a member of the School Board.
 
 
 12
 The remaining 10 included 5 who 'by objective standards, simply do not meet the minimum qualifications for employment in the reorganized school system'. This same measure was applied to all teachers without reference to race.
 
 
 13
 This leaves 5 Negro teachers not continued in the schools. The record of every one of them was scrutinized by the District Judge, who made this finding:
 
 
 14
 'By way of summary, four out of these five teachers were rated by their own Negro principal to be average or below average teachers. The evidence shows that all of the employed competing white teachers were appraised by their respective principals or by the Superintendent as being much better than average. The School Board and the Superintendent have satisfactorily explained, almost beyond argument it seems to me, their failure to employ at least fifteen out of the sixteen members of the class. Mrs. Loree G. Jackson is apparently an excellent teacher. If it were my responsibility to weigh her qualifications against those of the competing teachers, I might consider her to be as well, or even better, qualified than they. But that responsibility is not mine.'
 
 
 15
 Whatever Constitutional guidelines are recognized, the bald facts here plainly reveal that at least 15 of the 16 unretained teachers were not kept because of their own perference, their physical incapacity or their failure to meet minimum criteria. This is hardly a record of a racial judgment. General principles do not supplant realities; the Constitutional fundamentals stressed by the majority are here abstract and academic.
 
 
 16
 As the findings of the District Judge, upon his plenary re-examination of the school authorities' decisions, cannot be declared clearly erroneous, his decree should be affirmed.
 
 
 17
 I am authorized by Judge BOREMAN to state that he joins in this dissent.
 
 
 
 [1]
 They rely upon 42 U.S.C. 1983 and the Equal Protection and Due Process Clauses of the Constitution of the United States
 
 
 [2]
 As principal of one of the white schools put it: 'It's like picking a wife, I might find her attractive, you may not.'
 The superintendent gave as justification for his failure to employ several of the plaintiffs-- 'personal preference.'
 
 
 [3]
 While all of the improperly discharged teachers are entitled to re-employment, we do not think any practical benefit would be derived by requiring the Board to offer re-employment to a teacher who failed to meet definite, objective minimum standards. Especially is this true since the teachers are all presently employed and consequently could not accept the jobs until the next school year. In the interim, it is to be expected that the Board will have adopted with the court's approval satisfactory regulations and will have applied such standards in the process of renewing all of its faculty contracts for the coming year