520 F.2d 871
 11 Fair Empl.Prac.Cas. 677,
10 Empl. Prac. Dec. P 10323A
Joseph H. MORTON et al., Appellants-Appellees,
v.
CHARLES COUNTY BOARD OF EDUCATION et al., Appellees-Appellants.
 Nos. 74-1817, 74-1818.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1975.
Decided July 24, 1975.
 
 Elliott C. Lichtman, Washington, D. C. (Joseph L. Rauh, Jr., John Silard, Rauh & Silard, Washington, D. C., Juanita Jackson Mitchell, Mitchell & Mitchell, Baltimore, Md., Jack Greenberg, James M. Nabrit, III, Norman Chachkin and James C. Gray, Jr., New York City, on brief), for appellants-appellees.
 William L. Marbury and E. Stephen Derby, Baltimore, Md. (Judith K. Sykes, Baltimore, Md., Edward S. Digges and Richard J. Clark, La Plata, Md., on brief), for appellees-appellants.
 Before BRYAN, Senior Circuit Judge, and BUTZNER and FIELD, Circuit Judges.
 FIELD, Circuit Judge:
 
 
 1
 This action was instituted in January of 1971 by eight black individuals alleging discriminatory conduct in the operation of the public school system of Charles County, Maryland. Six of the plaintiffs were adults who charged that they and the class of individuals which they purported to represent had been refused employment or promotion, or had been demoted or discharged by the defendants on grounds of race. The other two plaintiffs were infants who were students in the Charles County School System and alleged that they sued on behalf of themselves and as representatives of a class consisting of all black students in the school system who were being deprived of their civil rights because the defendants had maintained racially identifiable faculties. The parties engaged in broad and exhaustive discovery procedures and on November 9, 1973, the court determined that the prerequisites to a class action had not been met by either the adult or infant plaintiffs. Thereafter, nine additional adults moved to intervene as plaintiffs, alleging that they had been the victims of racial discrimination on the part of the defendants.
 
 
 2
 The district court conducted a twelve-day trial and filed an opinion in which it engaged in a meticulous review of the evidence and made detailed findings of fact. The claims of discrimination of the fourteen adult plaintiffs[1] were carefully examined and with the exception of one claim were found to be without merit. In the case of Mrs. Elnora Pinkney the court found that the failure to appoint her as principal of an elementary school in 1969 was the result of racial discrimination. With respect to the claims of the student plaintiffs relative to the racial composition of faculties, the court found that the School Board had attained an appropriate faculty ratio as required by Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4 Cir. 1969), in all but five of its twenty-six schools.[2] The court noted that in three of these five schools the shifting of one teacher would bring the school into conformance with the test suggested by the plaintiffs and that in all other schools the shifting of only two teachers would be necessary. The only school falling substantially below this test was the Vocational Educational Center which included a number of specialized faculty positions.
 
 
 3
 Based upon the findings in its opinion the court entered an order which (1) granted judgment in favor of the defendants with respect to the claims of all of the adult plaintiffs with the exception of Mrs. Pinkney; (2) declared that the ratio of black and white faculty members in each school should be not less than 75 per cent nor more than 125 per cent of the ratio of black teachers throughout the system;[3] (3) granted judgment in favor of Mrs. Pinkney in the amount of $15,796, being the difference between the salary actually paid to her and the salary she would have received as principal of an elementary school for the years 1969 to 1974;[4] and (4) awarded attorneys' fees of $12,000 payable to counsel for Mrs. Pinkney and the infant plaintiffs.
 
 
 4
 Upon their appeal, the plaintiffs request that we reverse the judgment of the district court and direct that it take the following remedial measures. First, grant declaratory and injunctive relief prohibiting continuance of the hiring, promotion and demotion practices which plaintiffs allege have caused continued attrition in the percentage of black faculty members in the school system. Second, issue an injunction requiring the institution of affirmative hiring, promotion and demotion policies designed to restore the ratio of black principals and teachers to that which existed in the school system at the time desegregation was undertaken. Third, set aside the adverse findings made by the district court against the thirteen adult plaintiffs, and reconsider their claims by applying a presumption of racial discrimination and placing upon the defendants the burden of proving that discriminatory policies played no part in the rejection, non-promotion or demotion of each individual plaintiff. Fourth, award compensatory and other relief to all members of the class of unsuccessful black applicants for promotion and hiring in the Charles County School system since 1968.[5]
 
 
 5
 Primarily the plaintiffs contend that the district court failed to give the appropriate presumptive weight to the statistical evidence of racial discrimination in the Board's employment practices. They point to the fact that whereas in 1966-67, the year prior to complete desegregation, 44.2 per cent of the teachers were black, the proportion of black teachers had declined to 30.4 per cent in 1969-70, and that in the same years the percentage of black principals had dropped from 37.5 per cent to 30.7 per cent. These statistics, the plaintiffs argue, call for the invocation of the principle set forth in Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4 Cir. 1966), that "in the face of the long history of racial discrimination * * * the sudden disproportionate decimation in the ranks of Negro teachers raise(s) an inference of discrimination which thrust(s) upon the School Board the burden of justifying its conduct by clear and convincing evidence." The district judge rejected this contention of the plaintiffs, and we agree with him that this is not a Chambers case. First of all, unlike Chambers where the school system resisted "the mandate of Brown until forced to do so by litigation," Id. at 192, the Charles County Board had taken affirmative steps to desegregate its schools in the light of the evolving law and it is conceded that complete desegregation in the county had been voluntarily accomplished in 1967. Also, unlike Chambers, in the present case there was no sudden disproportionate decimation in the ranks of Negro teachers incident to the complete integration of the school system. On the contrary the district judge found that "there is no claim or evidence that any teacher or principal was discharged because of his or her race." Common to Chambers and its progeny in this circuit[6] was the fact that in each case a substantial number of black teachers had been discharged when the schools were integrated, and the significance of this factor was recognized by the Court in Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 209, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973), where the Court stated:
 
 
 6
 "Again, in a school system with a history of segregation, the discharge of a disproportionately large number of Negro teachers incident to desegregation 'thrust(s) upon the School Board the burden of justifying its conduct by clear and convincing evidence.' " (Emphasis added).
 
 
 7
 In addition to the foregoing, the record clearly demonstrates that the statistical changes upon which the plaintiffs rely so heavily were not the result of any discriminatory hiring policies of the Board, but rather were the result of dramatic demographic changes which occurred in Charles County in the 1960-1970 decade. Charles County is a small county in southern Maryland which is experiencing rapid growth as the suburbs of the District of Columbia expand. Between 1960 and 1970 the population increased 46.4 per cent from 32,500 to 47,700. In that same period the number of students in public schools increased from 7,400 in 1960 to 13,000 in 1970, and had further increased to 16,300 in 1973. This rapid growth in both population and school enrollment consisted primarily of an increase in white population and white pupils. While in 1970 the black population of the county had slightly increased in absolute numbers, the percentage of black population had declined from 34 per cent in 1960 to 29 per cent in 1970; and the percentage of blacks in the school population had declined from 45.7 per cent in 1960 to 39.9 per cent in 1970 and dropped even lower to 34 per cent in 1973.
 
 
 8
 During this same period the number of black principals in the school system increased from six to eight and in 1973 stood at 30.7 per cent while the number of black vice-principals increased from four to six and reached about 45 per cent. The number of black administrators in the central office of the school system increased from four to ten, being 22 per cent of that job classification. The number of black teachers had increased from 198 to 207, although the percentage decreased to 27 per cent. The district court carefully analyzed the school statistics in the light of the percentage decrease of blacks in the general population as well as the school system, and also took into consideration the statistical data bearing upon the percentage of blacks in the relevant employment pool from which the School Board, of necessity, drew a substantial number of its employees. Upon consideration of all of the relevant statistical data and underlying evidence bearing thereon, the district judge concluded that the evidence did not disclose a pattern of racial discrimination which required or justified the application of the so-called Chambers rule. The record solidly supports the findings of the district court and, assuredly, they are not clearly erroneous.[7] Williams v. Albemarle City Board of Education, 485 F.2d 232 (4 Cir. 1973); Bridgeport Guard., Inc. v. Members of Bridgeport C.S. Com'm., 482 F.2d 1333 (2 Cir. 1973).
 
 
 9
 The proposal of the plaintiffs that the court direct the Board to institute an affirmative policy which will restore the ratio of black principals and teachers to that which existed in the system prior to desegregation of the schools would require the court to close its eyes to the changes which have taken place in Charles County during the past ten years. We are unaware of any constitutional principle which would require that the racial ratios which existed in the school system of the county in 1966-67 be rigidly maintained ad infinitum despite the changing character of the surrounding area. On the contrary, the inevitability of such changes was recognized by the Chief Justice in Swann v. Board of Education, 402 U.S. 1, 31-32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971).
 
 
 10
 "It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary."
 
 
 11
 In our opinion the present case falls within this observation of the Chief Justice, and the record satisfies us that despite the changing population ratio the Board has taken reasonable and affirmative steps to bring substantial numbers of qualified blacks into every facet of the school system.
 
 
 12
 Finally, a brief comment about the special committee report upon which the dissent appears to place considerable reliance. In the spring of 1969 a dispute arose over the selection of majorettes at La Plata High School and at the suggestion of the Board of Education and the NAACP a committee was appointed by the State Board of Education to make an investigation of a variety of complaints and report its recommendations to the Board. The committee was purely of an ad hoc nature and, as noted by the district judge, was not charged to apply either constitutional or statutory standards in its investigation. The committee's investigation was not conducted as an adversary proceeding nor were the individuals interviewed by it subject to cross-examination. The State Board discussed the committee report with representatives of the Charles County school system and the NAACP and thereafter adopted some of the committee's recommendations, modified some and refused to adopt others. Again, as noted by the district judge, the action of the State Board on the report did not purport to be based upon either constitutional or statutory principles.[8]
 
 
 13
 While the dissent does not go so far as to accept the plaintiffs' contention that the district court was bound by the committee report and had a responsibility to enforce its findings as well as the recommendations of the State Board, it nevertheless relies upon the report as demonstrating "a history of segregation" under the Keyes formula. This, we think, accords the report an unwarranted role in this litigation. While the district judge permitted the committee report to be introduced into evidence, he ultimately reached the conclusion that its relevant findings lacked support and made his independent findings based on the evidence before him. In doing so he acted well within the permissible area of his discretion. Even if the report were conceded some official gloss its admissibility would be highly questionable, see Moss v. Lane Company, Incorporated, 471 F.2d 853 (4 Cir. 1973); Cox v. Babcock and Wilcox Company, 471 F.2d 13 (4 Cir. 1972), and in any event, it "is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial." Smith v. Universal Services, Inc., 454 F.2d 154, 157 (5 Cir. 1972). The fallacy of placing any operative reliance on the report is more readily apparent if we reverse the circumstances. Had the state committee given carte blanche approval to the manner in which the Charles County schools were being operated, we doubt that anyone would seriously contend that such a report would constitute a defense to the plaintiffs' law suit or that it would be entitled to any substantial evidentiary consideration on the issues.
 
 
 14
 In our opinion the district court granted full and appropriate relief and we affirm its judgment in all respects.[9]
 
 
 15
 Affirmed.
 
 BUTZNER, Circuit Judge (dissenting):
 
 16
 This case reaches the wrong result because of two basic errors of law. The first error is the allocation of the burden of proof, which was placed on the black complainants. It should have been placed on the school board in conformity with Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 209, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973), which teaches that "in a school system with a history of segregation, the discharge of a disproportionately large number of Negro teachers incident to desegregation 'thrust(s) upon the School Board the burden of justifying its conduct by clear and convincing evidence.' " Therefore, the initial inquiry should be to determine whether the Charles County school system has a history of segregation.
 
 
 17
 Until 1954 the county board operated a dual system, and not until 1967 were all of the schools desegregated. In the course of integrating the pupils, the racial composition of faculties underwent changes that were investigated by a special committee appointed by the Maryland State Board of Education. The committee filed an extensive report condemning the racial discrimination practiced by the school board in hiring and promoting the schools' professional and administrative staffs. The State Board of Education approved the committee's recommendations calling for the extensive recruitment of qualified black personnel and the establishment of fair and clear procedures for promotion that would apply equally to all candidates. When it became apparent that the school board was disregarding these recommendations, black students, parents, and faculty instituted this action. The first factual predicate for shifting the burden of proof mentioned by Keyes is "a history of segregation." The school board's former operation of a dual system of schools and the report of the State Board of Education amply demonstrate that this prerequisite has been met.
 
 
 18
 The second element of the Keyes formula is also satisfied. The record demonstrates that, incident to desegregation of the schools, the board disadvantageously treated a disproportionately large number of black personnel, not by discharge, as mentioned in Keyes, but by its hiring and promotion policies. For the purposes of shifting the burden of proof, the difference between discharging black teachers and refusing to hire or promote them is inconsequential. The board's practices, though more subtle than outright discharge, nevertheless disproportionately diminish the black faculty. The record shows that when the pupils were segregated, 50 percent of the principals were black and 50 percent were white. After desegregation of the schools, the percentage of black principals decreased to 30 percent and that of white principals increased to 70 percent. Before desegregation, black teachers constituted 44.2 percent of the faculties, but by 1973 the ratio had dropped to 27.4 percent.
 
 
 19
 I therefore conclude that both of Keyes' factual prerequisites for shifting the burden of proof have been satisfied and that it was error to fail to place on "the School Board the burden of justifying its conduct by clear and convincing evidence." 413 U.S. at 209, 93 S.Ct. at 2698.
 
 
 20
 The school board, however, contends that even if the burden shifted, the judgment should be affirmed. But a proper examination of the record refutes its claim. This brings us to the second basic error of law that flaws this case: the fallacious premise that the evidence must reveal purposeful discrimination in order for the complainants to prevail. This is contrary to Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Wright teaches that in deciding whether a school board has acted lawfully, a court must focus "upon the effect not the purpose or motivation of a school board's action." 407 U.S. at 462, 92 S.Ct. at 2203. Rather than ascribe good or evil motives to the board, it is sufficient to look to the effect of its conduct on the professional staff.
 
 
 21
 The record disclosed that despite the admonition of the State Board of Education to recruit qualified black personnel extensively, the school board has curtailed recruitment. In 1967-1968 there were 14 recruiting visits by blacks to various colleges. In 1968-1969 there were none, but during the same term there were 76 recruiting visits by whites. Recruiting by blacks picked up temporarily after the State Board of Education criticized the county board, but in 1973-1974 the number of visits dropped to two. The lack of the board's recruitment efforts has a significant effect the board hires four white teachers for every black. This disparity cannot be attributed to unequal qualifications. From 1967 to 1973 the board hired 47 white teachers and only 4 black teachers with no degree and low state certification. In 1971 the supervisor of personnel services directed his assistant to select for interviews from among the black applicants only those with a superior or above average rating. No similar limitation for white applicants was disclosed. It is quite clear, therefore, that the disparity in the board's hiring of blacks and whites cannot be attributed to rational quality control. Moreover, the absence of fair and clear procedures for promotion that apply equally to all candidates has resulted, during the years following integration of the pupils, in doubling the number of white principals while the number of black principals remained static.
 
 
 22
 The school board also places emphasis on the demographic changes in Charles County, intimating that an increase in the number of white pupils justifies the proportionate shift to white teachers. This argument flies in the face of Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4th Cir. 1966), where we held "reduction in the number of Negro pupils (does) not justify a corresponding reduction in the number of Negro teachers." Furthermore, this court has never subscribed to the theory that the racial composition of faculties should mirror the racial composition of student bodies. Indeed, if this new theory were to be applied conversely where black pupils outnumber white, some of the largest cities in this circuit would have to radically change the racial composition of their administrative and teaching staffs, an obligation that this court has never heretofore seriously considered.
 
 
 23
 The school board also contends that the decrease in proportion of black teachers is due to lack of enough black applicants in the county to staff the schools and to inadequate housing in the county. Yet the board does not look only to the availability of white teachers living in the county, and for years both black and white teachers have been recruited from colleges all over the country. Consequently, the number of black applicants who live in the county is irrelevant. Further, white employees recruited from outside the county have to find housing, so the lack of housing is also irrelevant.
 
 
 24
 In sum, the board has utterly failed to justify its conduct by clear and convincing evidence as required by Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). I would, therefore, reverse the district court's judgment on this aspect of the case and remand for the entry of class relief that would assure the termination of the board's discriminatory hiring and promotion policies. The board should be required to establish definitive objective standards for employment and promotion and to apply them alike to all personnel "in a manner compatible with the requirements of the Due Process and Equal Protection Clauses of the Constitution." Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 193 (4th Cir. 1966); see also Walston v. County School Board of Nansemond County, Virginia, 492 F.2d 919 (4th Cir. 1974); North Carolina Teachers Association v. Asheboro City Board of Education, 393 F.2d 736 (4th Cir. 1968); Wall v. Stanly County Board of Education, 378 F.2d 275 (4th Cir. 1967).
 
 
 25
 The district court denied 13 claims pressed by individuals who charged they were prejudiced by the board's discriminatory employment policies. It also declined to allow the case to proceed as a class action embracing all black applicants who had been denied teaching positions or promotions.
 
 
 26
 The basic errors of law that invalidate the denial of injunctive relief also permeate the dismissal of the individual claims. The court erroneously placed the burden of proving racial prejudice or discriminatory purpose on the individual claimants. For example, a black principal, William L. Griffis, who had served for 16 years in a black school was demoted over the protest of all the teachers in his school one year after the pupils were integrated. The district court accepted the board's conclusory statements that he was a weak administrator and that his supervisors had not recommended him. It made no finding of the underlying facts about his alleged lack of ability, and it ruled that Griffis had failed to prove that the board's decisions were "made on the basis of race, or because of any racial prejudice." However, as I have previously mentioned, the principles of law dictated by Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), and Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), require the school board to assume the burden of proof and the court to evaluate the evidence by ascertaining the effect of the school board's actions, not its motivation.
 
 
 27
 The class action aspect of the case is not essentially different from other employment cases involving racial discrimination for which there is ample precedent for class relief. E. g., Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Walston v. County School Board of Nansemond County, Virginia, 492 F.2d 919 (4th Cir. 1974); Rock v. Norfolk and Western Railway Co., 473 F.2d 1344 (4th Cir. 1973); North Carolina Teachers Association v. Asheboro City Board of Education, 393 F.2d 736 (4th Cir. 1968). Accordingly, I would vacate those portions of the judgment that dismiss the class action and the claims of individual complainants and remand the case for reconsideration in light of Keyes and Wright.
 
 
 
 [1]
 After the institution of this suit one of the plaintiffs, Ortis J. Cobb, was permitted to withdraw as a party plaintiff on October 12, 1972
 
 
 [2]
 The plaintiffs suggested that the standard of Nesbit would be met where the ratio of black teachers to white teachers in each public school in the county was not less than 75 per cent nor more than 125 per cent of the ratio of black teachers to white throughout the entire system
 
 
 [3]
 On this issue the court accepted the standard suggested by the plaintiffs. See, n. 2, supra
 
 
 [4]
 The Board was further directed to compensate Mrs. Pinkney on the basis of a principal's salary until her retirement and to make such additional contributions to the Maryland Teachers Retirement System on her behalf as would have been made had she held the position of principal since 1969
 
 
 [5]
 The plaintiffs contend that the alleged discriminatory practices injured all unsuccessful black applicants for positions in the Charles County school system and that the district court plainly erred in refusing to permit the plaintiffs to pursue their class action. They further suggest "that a special master could be appointed to receive the individual applications for relief," with directions that the master apply the presumption of discrimination set out in "Third" above
 
 
 [6]
 See, Walston v. County School Board of Nansemond Cty., Va., 492 F.2d 919 (4 Cir. 1974); North Carolina Teachers Ass'n v. Asheboro City Bd. of Ed., 393 F.2d 736 (4 Cir. 1968)
 
 
 [7]
 In Mayor v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), the Court criticized the use of "simplistic percentage comparisons" and observed:
 "We share the view expressed in the dissent that facts in a case like the instant one, 'when seen through the eyes of judges familiar with the context in which they occurred, may have special significance that is lost on those with only the printed page before them.' * * * That is one reason why we believe that the Court of Appeals, 'with only the printed page before (it) . . .,' erred in reversing the District Court. The judge most 'familiar with the context in which (the facts) occurred . . .' was obviously the District Judge, since he heard and viewed the testimony and other evidence presented." Id., at 620, n. 20, 94 S.Ct. at 1334.
 
 
 [8]
 It was conceded by the plaintiffs that none of them had seen fit to pursue the available Maryland statutory remedy by which a person aggrieved by actions of the county school administration may present a complaint to the School Board and, if dissatisfied with the action of the Board, appeal to the State Board of Education. Anno.Code of Md., Art. 77 § 59 (1969 Repl.Vol.)
 
 
 [9]
 The cross-appeal of the Board of Education challenges the award of damages to Mrs. Pinkney, but we are not persuaded that the finding of the district court on her claim was clearly erroneous